Reed, J.,
delivered the opinion of the court.
Our statute giving a lien to an agistor is as follows (2 Mills’ Stats., sec. 2854; Gen. Stats., sec. 2118; Amended Acts of 1889, p. 232): “ Any ranchman, farmer, agistor, herder of cattle, tavern keeper, livery stable keeper, or other person to whom any horses, mules, asses, cattle, sheep or hogs shall be' intrusted for the purpose of feeding, herding, pasturing, keeping or ranching, shall have a lien upon such horses, mules,' asses, cattle, sheep or hogs, for the amount that may be due for such feeding, herding, pasturing, keeping or ranching, and for all costs incurred in enforcing such lien.” * * * •
The suit was brought under this section of the statute-to secure and enforce a lien upon the cattle for the food consumed.
“ Agistment is where a person takes in and feeds or depastures horses, cattle, or similar animals upon the land for reward.” The lien for agistment is purely statutory; no lien-existed at common law. Chit, on Cont., 435; 1 Smith Lead. Cases, 222; Jackson v. Cummins, 5 M. & W. 341; Smith v. Cook, 1 L. R. Q. B. Div. 79. The agistor had no lien except by special agreement. Goodrich v. Willard, 7 Gray (Mass.), 183; Miller v. Marston, 35 Me. 155; Grinnell v. Cook, 3 Hill (N. Y.), 485.
The language of our statute giving the lien is: The “ person to whom any * * * cattle * * * shall he intrusted for' the purpose of feeding, herding, pasturing, keeping or ranching,” etc.
The lien is for the food and care expended upon the cattle-of another, where the cattle are intrusted to his care. They must be delivered into his possession and subject to his control, and the bailment is such, and his possession so exclusive, that he may maintain trespass or trover against a wrong-' doer for any injury to their possession, — Story on Bailments, sec. 443; Sutton v. Buck, 2 Taunt. 309; Rooth v. Wilson, 1 Barn, and Ald. 59; Burton v. Hughes, 2 Bing. 173,— and is *540 only responsible for ordinary negligence. Jones' on Bailments, 91 and 92; McCarthy v. Wolfe, 40 Mo. 520.
The’complaint makes a case clearly within the law of agistment, entitling, if sustained by evidence, the plaintiff to the lien: That from October 21st and 28th until December 3d, Travis, as agistor, had pastured the cattle; “that from and after the last date, and until March 17, 1893,” at the special instance and request of said Quincy, he, Travis, fed hay owned by him to said cattle, etc.
By the second paragraph of the contract above cited, it is obvious-that the plaintiff leased to the partnership, of which he was a member, the real estate described, with all the rights and easements pertaining, and, as shown by a subsequent paragraph, for. the term of five years. Such leasing yvas exclusive of any individual right or possession of the plaintiff. By the terms of the contract,- Quincy was to manage the partnership affairs, and, for-the partnership, to enter into the possession and exercise sole control of the leased premises.
Pursuant to the contract of partnership, a few days after its execution, Quincy purchased from the defendants Auld. and McCorkle the cattle, 1,047 in number, received the possession of them, placed them upon the land leased from the plaintiff, and during all .the,time, Unfil possession was taken by defendants Auld and McCorkle, had exclusive custody, management and control of them, under the provisions of the contract.
.. It is alleged in the complaint that the, cattle were intrusted to him (plaintiff) by Quincy, and that he fed the hay to them', at the special instance and -request of Quincy. Such being the allegation., even if established by the evidence, we are at a loss, to understand how a judgment and decree could be entered against Auld and McCorkle, who had never delivered: cattle into his possession, intrusted him with hay, or made: a,.ny contract for feed or care.
It is evident from the contract,: arid.all the.evidence .in the.-, case, that the three tracts of land ,were„ devoted .to partner-, ship uses by the plaintiff. Quincy Avas to buy cattle at market *541 rates, and manage the entire business; the third partner to furnish the money for current expenses. Cattle were to be pastured upon the leased premises, fed when necessary, and marketed. The cost of purchase of cattle, cost of caring for them, and feed, aside from the pasturage from the leased land, were to be deducted from -the amount realized, and the profits arising from the transactions divided equally between the three partners. The contract did not provide that Quincy should purchase the cattle for cash. The evidence of plaintiff shows that he understood that the cattle were .to be purchased upon credit, and at the time the cattle were delivered knew that they were purchased upon credit by Quincy. Consequently, until rescission of the contract of partnership, or until the title of the partnership was divested by default in payment of purchase money, the cattle were the property of the firm and in its possession, and under the management of Quincy, who was, by the terms of the contract, invested with the care and control. Hence we find the plaintiff attempting to assert an agistor’s lien against his own property, as well as that of his partners, for pasturage he had conveyed to the firm as his contribution to the capital stock, and for hay sold and delivered to the firm, one third of which, upon settlement, was chargeable to him, and the other two thirds to be paid by his partners.
This brief statement shows the impossibility of maintaining a lien, where the requirements are : First, that the cattle should be the property of another, in which the agistor had no rights-of ownership;, second, that the stock was delivered for the purposes of the agistment under a contract of hire, with an agreement to pay for the food and care.
The contention of plaintiff is that, by failure of Quincy to perform his part.of the agreement, he had a right to and did rescind the contract of partnership, and that it was void. If such were the fact, how could it affect Auld and McCorkle, 'who had dealt with the partnership in good faith, sold and •'delivered the cattle to the firm, and who had no notice of dissolution, nor protests ? In -other words, how could- a lien be *542 enforced against the property of Auld and McCorkle by reason of the failure of Quincy to perform his agreements with his partners?
The plaintiff contends that he rescinded the contracts of .the purchase of the cattle and the partnership ab initio — First, because chattel mortgages were given without his knowledge •to secure the purchase price; second, because Quincy had purchased the cattle above the market price. . These contentions may be briefly answered. First, they were matters with .which Auld and McCorkle had no connection, and of which they had no knowledge.
He testified to his lack of knowledge, bub from his testimony it is impossible to determine when he first had knowledge of their existence. The mortgages were recorded very shortly after their execution. He testified that he had no knowledge before they were filed for record. Again, that he had actual knowledge by a letter from the recorder, of January 20th, and had heard of them before that time. Again, ¡knew they had mortgages about the first of March. There is much evidence from which it might be inferred that he had knowledge about the time of the purchase, but inference is unnecessary. He, by his own evidence, fixes the date sufficiently early for the purposes-of this case. As a purchaser, it was his duty to know at the time of, the transaction. If he failed to. know by reason of his own. negligence, the responsibility rests upon himself. There is no attempt to charge any of the parties with concealing the fact from him. Whether he knew or not could not affect the rights or property of Auld and McCorkle, and as his share was in the profits, after .payments of purchase, it seems a matter of no legal importance .whether, the purchase price was secured by chattel mortgage or in any other way; 'the price was to be -paid at maturity of notes.
As to the supposed rescission of the contract, either in. purchase of the cattle from Auld and McCorkle, or the contract .of partnership, — as it seems rrnry uncertain which is claimed {to have been rescinded, — the testimony of plaintiff was pecu *543 liar as a basis for rescission. Although the cattle were purchased by Quincy and delivered to the firm, upon the ranch, he did not know the price of the cattle until a week after their delivery; that he said nothing to MeCorkle at that time; didn't know that he had, any interest in the cattle, and didn’t know Quincy bought them from him. In view of another part of the testimony, these statements are rather startling. Before the sale MeCorkle visited the ranch, examined pasturage and bay which was shown by the plaintiff. The object of such investigation must have been stated, if not apparent, to ascertain if there was an adequate supply of food, so that his security for the purchase money would not be jeopardized. These circumstances must have convejmd, to any man of ordinary intelligence, the facts: First, that the cattle were to be purchased upon credit; and, second, .that the seller would rely upon the cattle as security. He also testified that he did not ask.Quincy or MeCorkle the price paid ; that he did not know the price on November 1st, when requested to sign the note ; did not figure from them the price, because he knew they were too high; that he knew the price before or at the time the second lot were delivered, tohich was October 28th, as Quincy had told him. Comment upon these two statements is unnecessary. He also testified that upon learning the price of the stock he (mentally) repudiated the contract of partnership, did not accept the cattle as partnership property, but for the purpose of pasturage ; but did not inform either Quincy or MeCorkle of his repudiation or intention until some time in February, allowing his partners to continue the feeding and care of the cattle and expenditure of money until that date, under the partnership contract he had repudiated at its inception in October. After the food was consumed, and it became evident that his supposed speculation was a failure, he gave notice of his rescission, and attempted to shift his position and become an agistor instead of a partner.
It is a well settled rule of law that.when a party has an election to rescind an entire contract, he must rescind it *544 wholly or in no parti He cannot consider it void for one purpose, and at the same time in force for the purposes of recovering damages. 2 Chit. on Cont., 1089; Miner v. Bradley, 22 Pick. 457; Voorhees v. Earl, 2 Hill (N. Y.), 292; Junkins v. Simpson, 14 Me. 364; Coolidge v. Brigham, 1 Met. (Mass.) 550.
If a party, having the right to rescind a contract, dees any act which amounts to an admission of the existence of the contract, he cannot' afterwards elect to treat it as void. Brinley v. Tibbetts, 7 Greenl. 70; Lindsey v. Gordon, 13 Me. 60; Barry v. Palmer, 19 Me. 303; Lawrence v. Dale, 3 Johns. Ch. 23; Masson v. Bovet, 1 Denio, 69; Selway v. Fogg, 5 M. & W. 83.
It is shown by all the evidence, including that of plaintiff, that although knowing the price paid for the cattle in the latter, part of October, and mentally resolving to rescind at that time, he gave no notice of any such intention, acted under the contract, carried out its provisions, and recognized it as binding and obligatory until some time in February following.
Another well settled rule of'law is that one party to a contract cannot rescind when both cannot be placed in the identical situation which they occupied when the contract was made. Where this cannot be done, there can be no rescission, and the party must proceed for damages for failure to perform. 2 Chit. Cont., 1092.
There is practically no limit to the number of cases, English and American, asserting the proposition. It at once becomes apparent .that it was impossible in February to place the parties in statu quo as'of October previous.
It is also an equally well settled rule of law that when a party, by reason of fraud or failure of the other party to perform,. has the right of rescission, he must exercise it at once, as’ soon as the fraud comes to his knowledge or the default occurs. 2 Pars. on Cont., 797; Central Bank v. Pindar, 46 Barb. 467; Burge v. Railroad Co., 32 Iowa, 101; Zuck v. McClure, 98 Pa. St. 541; Wilson v. Morsey 52 Wis. 240.
*545 A party cannot play “fast and loose” at the same time, await results, and then make his election. ■
As to the 280 tons of hay fed to the cattle, plaintiff’s testimony shows it to have been measured up and turned over to Quincjr at an agreed price of $4.50 per ton, to be fed to the cattle pursuant to an agreement. He became creditor of the firm. The hay amounted to $1,260, two thirds of which, or $840, should have been paid by his partners; but he'testified that he, in the first instance, required money from his partners and they advanced him $1,000, a sum exceeding the two thirds of the value of the hay furnished.
. The finding and judgment of the district' court cannot be sustained. The allegations in the complaint are not only not sustained by any evidence in the case, but contradicted by all of it, including that of the plaintiff. No single fact to bring the transaction within the law of agistment was established. The finding and decree of the district court will be reversed.

Reversed.